620

[Civ. No. 4342.   Fourth Dist.   Mar. 6, 1952.]

OLIVER WENDELL HOWARD et al., Plaintiffs and Appellants, v. TRIANGLE FREIGHT LINES (a Corporation) et al., Defendants and Appellants.

Werdel & Di Giorgio for Plaintiffs and Appellants.

Johnston, Baker & Palmer for Defendants and Appellants.

BARNARD, P. J.—The plaintiffs were injured in a collision between an automobile in which they were riding and a truck and trailer owned by Triangle Freight Lines, a partnership, and driven by Walker, an employee of the firm. The accident occurred on the night of May 20, 1949, on Highway 99, a few miles north of Bakersfield. At that point there were two northbound lanes and two southbound, separated by a barrier 20 feet wide. Just prior to the accident both vehicles were traveling north in the easterly or outer lane, the truck at 30 to 35 miles an hour and the Howard car at 40 to 45 miles. A copper air line on the truck, which ran to the trailer, suddenly broke and the loss of air locked the brakes on the trailer but not those on the truck. Walker immediately turned his equipment toward the right-hand or east shoulder. While the equipment was partly on the shoulder and partly on the highway the Howard car crashed into the left rear corner of the trailer.

The complaint in this action alleged that Walker, without warning, operated the truck in such a negligent and reckless manner as to cause it to suddenly stop on the highway, thereby causing the plaintiffs to run into it. The next paragraph alleged that the braking and signaling equipment on the truck was so defective and unsafe as to render it "possible and probable that . . . the braking system would suddenly lock and stop said motor truck without warning or signal to vehicles behind"; and that each of the defendants knew, or should have known, of this defective condition.

There is little, if any, conflict with respect to the facts of the case. Mr. Howard testified that as he was driving north he saw this equipment in front, in the easterly lane, with clearance lights burning at the rear; that he had it in mind to pass the truck when he got close enough; that "just about that time" he noticed he was rapidly gaining on the truck;

that he decided that the truck had stopped and whirled his car to the left to miss it, hitting his brakes at the same time; that he did not know whether or not the truck was stopped when the impact occurred; that "I had made up my mind that the truck equipment had stopped when 'I was three or four car-lengths behind it"; that the passing lane to his left was clear; that the lights on the rear of the truck did not change; and that there was no other vehicle between his car and the truck at any time after he saw the truck a quarter of a mile ahead.

The driver of the truck testified that he had driven trucks for many years, and had never known an air line to break suddenly before; that he made a routine check of the equipment at Bakersfield and everything was normal and the air gauge and brakes were working perfectly; that the air line suddenly broke, locking the brakes on the trailer which slowed the equipment down fast; that this happened two or three seconds before the impact; that he pulled over toward the shoulder, figuring with the power of the motor and the momentum he could get the truck off the highway; that from the time the air line broke he got to a stop in about 55 feet; that he got the truck partly on the shoulder when the impact occurred; that there was no other vehicle near except the Howard car; and that the passing lane to the left was entirely clear. He further testified that the break occurred where the copper tubing is joined to the air gauge on the dash by a fitting; that the break occurred in this fitting, and was "right inside" of the nut and behind the instrument panel; that in repairing the break he cut off an inch at the end of the tube and just dropped the part he cut off; that he then flared the end of the tube and fastened it back into the gauge by tightening the nut which holds it tight; that this fitting which he used was the flare type and was a part of the air gauge on the instrument panel; that there was also a ferrule type fitting in the tool box but he did not use this except as a temporary plug in releasing the brake, so he could get the equipment completely onto 'the shoulder; that this particular air line is a standard fitting; and that a GMC has its own instrument panel and the instruments are a part of the truck.

One of the owners of the truck testified that he arrived at the scene of the accident about four hours after it happened; that in 1948 he had had a new cab put on the truck at a garage in Fresno; that when this was done a new engine was put in and the air brake lines were changed, and everything

overhauled "from stem to stern"; that there had been no breaks or leaks in the brake system since the overhaul job; that they had Bendix-Westinghouse air brakes which are standard equipment on 90 per cent of the trucks; that they have a mechanic and the truck was given a routine checkup once a week and the braking equipment was mechanically perfect just before the accident; that in some 12 years' experience as a trucker he had never heard of a copper line breaking; that the braking system was inspected within a week of the accident; that standard Westinghouse brakes were on this system; and that to the best of his knowledge "all the fittings on this truck were standard Westinghouse Bendix fittings." He was shown the ferrule type Westinghouse fitting, which was admitted as Exhibit 4. He testified that he was not a parts man and did not know the number of standard fittings made by Westinghouse; that there were different types of connections and two different fittings; that there is a slight difference between these; and that there was a fitting on the instrument gauge of the truck which was "similar" to the one shown him.

A state traffic officer testified that he arrived at the scene a few minutes after the accident occurred; that the vehicles had stopped about 20 feet apart; that there were no discernible skid marks up to the point of impact; that he determined the point of impact, which was between 5 and 6 feet east of the center line dividing the northbound lanes; that the closest part of the truck and trailer was at least 15 feet from the point of impact; and that there were lights on the truck and trailer, but none on the Howard car.

A Mr. Deibel, called by the plaintiffs, testified that he was the manager of a brake and supply company and had had experience with brake lines and air brakes on trucks for 12 years. When asked "Are breakages in air-line systems rare occurrences or otherwise?" he replied, "I would say otherwise." He was shown the ferrule type fitting, Exhibit 4, and testified that it was a standard Bendix-Westinghouse air brake fitting and that the one on this truck was an SAE fitting; that normally a truck equipped with standard Westinghouse brakes uses the ferrule type fitting; and that where a normal Westinghouse setup was being used an SAE fitting would not be used because it would not be furnished. He was then asked "What is the reason why they don't furnish this type." The defendants' objections were overruled and the witness replied: "The reason why they don't furnish the SAE fitting

is because this type of fitting holds the tube more rigid and it will have less chance of the tube breaking, it has got more suppleness to the tubing than the SAE fitting does.'' A motion to strike this answer was denied.

At the request of the plaintiffs,the court instructed the jury that the defendant driver was the agent of the defendant owners, and that it followed ''that if one is liable, all are liable.'' During its deliberation the jury sent a message to the judge asking whether it could find a verdict for the defendant driver and still hold the defendant owners liable. The bailiff reported that the judge had said that he could not answer that question, but that he would have court opened and read the instructions on that. However, this was not done. The jury then brought in a verdict in favor of all of the plaintiffs and against all of the defendants. The court granted a new trial to the defendant driver, without mentioning insufficiency of the evidence, and denied a new trial to the defendant owners. They have appealed from the judgment, and the plaintiffs have appealed from the order granting a new trial as to the defendant driver.

■ On the appeal of the defendant owners it is first contended that the verdict against them was based upon the court's instruction ''that if one is liable, all are liable''; that they are liable only on the principle of agency; that there was no evidence of negligence on the part of the driver; and that the granting of a new trial to him legally exculpates them. There was no evidence of negligence on the part of the driver but it does not follow that the owners could not be liable, since they were also charged with negligence in knowingly permitting this equipment to be operated with such defective and unsafe brakes that a sudden stop would probably result.

■ It is next contended that it was prejudicial error to permit the witness Deibel to testify to the effect that a Westinghouse ferrule type fitting is superior to an SAE type fitting; that this is the only evidence of any negligence on the part of the owners; and that the evidence is not sufficient to show negligence on their part.

The issue was whether or not the owners had failed to use due care in furnishing this equipment, rather than whether or not a superior type of fitting was on the market. This testimony by Deibel should not have been admitted, and it was prejudicial, in the absence of further evidence making it material, and showing knowledge on the part of the owners. The evidence indicates that a Westinghouse brake system had

been originally installed on this equipment; that when a GMC cab was later installed the copper air tube was connected with the air gauge on the GMC instrument board; and that the SAE flare type fitting was a part of that air gauge. There is no evidence that the flare type fitting which was a part of the air gauge already installed, was not customarily used or that it was not a standard type of fitting furnished by manufacturers of such equipment. While Deibel was permitted to testify to the effect that he considered the ferrule type fitting superior to the other, there was no evidence that this opinion was generally shared by qualified persons and none that this fact, if true, was known or should have been known to the owners.

The plaintiffs argue that since there was evidence that the ferrule type fitting was normally furnished on Bendix-Westinghouse brake systems, and since the owners' maintenance mechanic was not called as a witness, the jury was entitled to infer either that the owners were negligent in not requiring their mechanic to see that such a fitting was installed on this truck, or were negligent in employing a mechanic who was so incompetent that he did not know that this fitting was not the usual Westinghouse fitting. This particular fitting, by which the copper tube was attached to the air gauge, was a part of the air gauge installed on the GMC instrument board and, so far as disclosed by the evidence, was a part of the regular GMC equipment placed there for that purpose. There is no evidence that the defendants had any knowledge as to the merits of selections made by different manufacturers. While there is evidence that a ferrule type fitting is normally furnished with Westinghouse brake equipment, there is no evidence indicating that it would normally be used to attach that equipment to an instrument board in a GMC cab, where a flare-type fitting is already provided and installed as a part of the air gauge. Moreover, this new cab was installed on the truck and the air brake system attached thereto in connection with a general overhaul at a public garage, and not by the owners' regular maintenance man. There is no evidence that the owners knew that this installation was not normal and usual, or that it was in any way inferior or unsafe.

The break, whatever caused it, occurred inside of a fitting installed by an outsider, and apparently furnished by the manufacturer of a large part of the equipment. It would be unreasonable to expect that this maintenance mechanic, in making ordinary checks of the truck, would question the

type of fitting furnished by one of the manufacturers or that he would take the various fixtures apart and search for such latent defects as the one which here developed. The break in the line occurred in a hidden place inside the nut on this fixture and behind the instrument board, and no ordinary or reasonable inspection would have disclosed it. There is no evidence in the record that the defendants knew that the ferrule type fixture was better than the flared type fixture, if this be true. The owner who testified said that he was not familiar with the number of standard fittings made by Westinghouse, and that he had thought the whole brake installation was a Westinghouse product. The only evidence in the record that the ferrule type fitting is superior is the opinion expressed by Deibel, based on the reason that it "holds the tube more rigid" and "has got more suppleness." He did not attempt to explain how a more rigid holding of the tube could make it more supple, or how this could make any difference within the fixture itself where, in each type, the end of the tube is firmly held for the purpose of making it air-tight. There was no evidence that the SAE type of fitting is not in common use, and no evidence that brakes in air lines have occurred any more often where they have been used. The plaintiffs allege that this braking equipment was so defective as to make it probable that such a break would occur, and that this defective condition was, or should have been, known to the defendants. The evidence is insufficient to support the first of these allegations, and there is no evidence at all which would support a finding that the defendants knew or should have known that such a defective condition existed. The testimony of Deibel to the effect that he considered one of these devices better than the other should not have been admitted under the circumstances and, in any event, it is not sufficient to sustain the burden of proof resting on the plaintiffs.

It is contended that the court erred in giving an instruction which stated that the sole defense of the defendants as against the claims of the minors was that the defendants were without negligence, and that "if you believe from a preponderance of the evidence that the defendants were in any manner negligent, even though such negligence be only in the slightest degree, and that such negligence proximately contributed to the accident" then the minor plaintiffs are entitled to a verdict. Different standards of care are required, under varying circumstances, but there are no different degrees

of negligence so far as material here. This instruction should not have been given, and it may have been prejudicial in view of the nature of the evidence as disclosed by the record.

It is further contended that the court erred in communicating with the jury, as above described, since this was done without the knowledge of the defendants or their attorneys. That this was irregular may be conceded, but no prejudice appears. The court had already erroneously instructed the jury in that regard, and the jury apparently acted upon that instruction.

█ On the plaintiffs' appeal it is contended that the court obviously thought there was sufficient evidence of negligence on the part of the driver, since the order granting him a new trial did not mention insufficiency of the evidence; that the only other ground the court could have had in mind was the irregularity in the communication between the court and the jury; and that this irregularity was so slight as not to justify a new trial for the defendant driver. It is argued that there is ample evidence of the negligence on the part of the driver; that he was inconsistent in saying that when the break occurred he hit his brakes to keep the truck from jackknifing, whereas there was other evidence that the truck would not have jackknifed anyway; that he was confused between flare type and ferrule type fittings; that although he testified that such breaks as this were very uncommon he happened to have a tube-cutting tool in the truck; and that he tossed away the broken end of the tube after he cut it off, which would have been material evidence to show whether the break was a new or old one. We see nothing in this evidence which would have supported a finding that the driver of the truck was guilty of negligence which contributed to the plaintiffs' injuries. Aside from the irregularity as to the communication between the judge and the jury, the erroneous instructions were sufficient to support the court's action in granting a new trial as to the defendant driver.

The order granting a new trial to the defendant driver is affirmed. The judgment against the defendant owners is reversed.

Griffin, J., and Mussell, J., concurred.